**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Zandra Manion, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>Ameri-Can Freight Systems Incorporated, et al.,<br><br>Defendants. | No. CV-17-03262-PHX-DWL<br><br>**ORDER** |

This case arises from a March 12, 2016 traffic accident that resulted in the death of Johnathan Blyler ("Decedent"). The vehicle that struck Decedent's vehicle was a tractor-trailer driven by Steven Robertson ("Robertson"), an employee of Ameri-Can Freight Systems, Inc. (together, "Defendants"). The plaintiffs are (1) Decedent's mother, Zandra Manion, who asserts a wrongful death claim under A.R.S. § 12-611 as a statutory beneficiary of Decedent, and (2) Decedent's wife, Lisa Blyler, who asserts both a wrongful death claim under A.R.S. § 12-611 in her capacity as a statutory beneficiary and a survival claim under A.R.S. § 13-1440 on behalf of the Decedent's estate (together, "Plaintiffs").

The Final Pretrial Conference is scheduled for August 26, 2019. (Doc. 91.) In anticipation of trial, the parties have filed three motions to exclude expert opinions. (Docs. 70, 71, 72.) Having reviewed those motions and the responses and replies thereto, the Court hereby rules as follows. The parties will be free at the Pretrial Conference to present additional argument concerning any of these rulings and attempt to convince the Court to change its mind.

# LEGAL STANDARD

Federal Rule of Evidence 702 governs the admissibility of expert testimony. "The party offering expert testimony has the burden of establishing its admissibility." *Bldg. Indus. Ass'n of Washington v. Washington State Bldg. Code Council*, 683 F.3d 1144, 1154 (9th Cir. 2012). As a threshold matter, an expert witness must be qualified "by knowledge, skill, experience, training, or education," Fed. R. Evid. 702, but "Rule 702 'contemplates a broad conception of expert qualifications,'" *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1015 (9th Cir. 2004) (citation and emphasis omitted).

Under Rule 702, a qualified expert may testify if: "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." The Federal Rules of Evidence obligate trial courts to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). Rule 702(a) "goes primarily to relevance" and "requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Id.* at 591-92. With respect to reliability, "the test under *Daubert* is not the correctness of the expert's conclusions but the soundness of his methodology." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010), *as amended* (Apr. 27, 2010) (citation omitted). To "assess the reasoning or methodology," courts should consider "such criteria as testability, publication in peer reviewed literature, and general acceptance, but the inquiry is a flexible one." *Id.* Courts should not exclude an expert's opinion merely because it is "shaky," because such evidence may "be attacked by cross examination, contrary evidence, and attention to the burden of proof." *Id. See also* Fed. R. Evid. 702, advisory committee note to 2000 amendments ("[P]roponents do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of evidence that their opinions are reliable. . . . The evidentiary requirement

of reliability is lower than the merits standard of correctness.") (citation and internal quotation marks omitted).

**ANALYSIS**

I. <u>Defendants' Motion Regarding Michael Shepston (Doc. 70)</u>

Defendants seek to preclude Plaintiffs' proposed accident reconstruction expert, Michael Shepston ("Shepston"), "specifically as it relates to avoidability analysis, perception time, visibility, avoidability conclusions, vehicle electrical systems and additional factors." (Doc. 70 at 1.) They argue (1) Shepston "provides opinions outside the scope of his specialized knowledge" and (2) Shepston's "opinions are not based on any specialized, scientific or technical knowledge and are not based upon reliable evidence." (*Id.* at 2, 4.) Although the motion is broadly titled, Defendants clarify in their reply that they "are not disputing the methodology of Shepston as to the [accident] reconstruction or his opinions on the reconstruction itself." (Doc. 80 at 2.)

In response, Plaintiffs contend: (1) "Defendants' motion attempts to characterize the entirety of Shepston's opinions as scientific and ignores the information he has provided related to the details of the testing he performed and the information he compiled in arriving at his opinions"; (2) Shepston's "opinions are based on his knowledge and experience as a professional accident reconstructionist and his extensive experience in performing investigative analysis of crashes"; and (3) "Defendants do not dispute that Shepston is a qualified accident reconstructionist, or assert that his opinions have not been adequately disclosed." (Doc. 76 at 4-5.)

A. **Accident Reconstruction**

As with many of the other pretrial motions in this case, the parties seem to be talking past each other to some extent. In their motion, Defendants did not indicate they were challenging Shepston's methodology as to the accident reconstruction, and they clarified in their reply that they were not making such a challenge. Thus, Shepston will be permitted to offer opinions regarding accident reconstruction at trial.

…

B. **Avoidability, Perception Time, Defendant's Reaction Time, Visibility**

Defendants seek to exclude "Shepston's opinions and testimony regarding avoidability, perception time, [Robertson's] reaction time, and visibility." (Doc. 70 at 5-6.) They argue (1) "Shepston does not have any scientific basis for his opinions that the area of the collision was well-lit, and visibility was clear or that [Decedent's] vehicle was visible from one-quarter mile out" and (2) "these opinions are outside of his areas of expertise as he does not have expert qualifications in the areas of visibility to offer an opinion." (*Id.* at 6.)

The Court generally agrees with Defendants. First, because Shepston didn't identify any methodology in support of his conclusion that "[t]he area of the collision was well-lit, and visibility was clear" (Doc. 70-2 at 9), Shepston will be precluded from testifying as to those opinions at trial. Fed. R. Evid. 702(c) (opinion must be "product of reliable principles and methods"). Notably, Shepston did not explain what it would mean scientifically for an area to be "well-lit" and conceded during his deposition that he did not conduct "any tests to determine luminescence of the area of the accident" or conduct any tests to determine "contrast." (Doc. 70-4 at 8.) In fact, Shepston's opinions on this topic appear to be based solely on a statement Robertson made to Arizona Department of Public Safety officers. (Doc. 70-2 at 7.) His testimony will not help the jury understand the evidence. *Cameron v. Lowes Home Centers Inc.*, 2019 WL 2617032, *2 (D. Ariz. 2019) (excluding expert testimony where expert's "opinion [was] not necessary to help the trier of fact understand [lay witness's] deposition testimony regarding whether Defendant followed its policies and procedures" because expert's "opinion d[id] not expound upon [lay witness's] testimony with principles and references from his experience that support his own conclusion" and "the jury [could] weigh [lay witness's] testimony for itself without [expert's] assistance").

Second, Shepston's opinion that Decedent's Jeep was visible from one-quarter mile out does not satisfy Rule 702. To form this opinion, Shepston relied only on deposition testimony in which Robertson "indicated . . . that, with his headlights on, he can see within

a quarter of a mile fairly easily." (Doc. 70-2 at 8.) Again, this opinion fails under both Rule 702(a) and 702(c)—Shepston's scientific knowledge is not helpful for the jury and Shepston's opinion is not based on any methodology. Accordingly, Shepston will be precluded from testifying to this opinion at trial.

Third, to the extent Shepston intends to testify that Robertson caused the collision because he was inattentive and "mirror-checking," Shepston did not rely on any "facts or data" or apply any "principles and methods" to formulate this opinion, and he will therefore be precluded from testifying to it. Fed. R. Evid. 702(b)-(c).

Finally, the Court disagrees with Defendants' contention that Shepston does not have a scientific basis for his conclusions regarding perception time. (Doc. 70 at 6.) Shepston testified in his deposition that he used a software program called Interactive Driver Response Research ("IDRR") for his perception time analysis, which allows the user to input different variables to determine perception times. (Doc. 76-1 at 38-41.) Defendants have not challenged Shepston's methodology but rather have conclusorily stated that Shepston "does not have any scientific basis for [this] opinion." (Doc. 70 at 6.) Because Defendants do not attack the basis on which Shepston relied (but mistakenly claim he had no basis), the Court will allow Shepston to testify to this opinion at trial.

C. **Vehicle Lights**

Defendants argue that "Shepston does not have the scientific data or specialized knowledge to present [the] opinions" that (1) Decedent's "vehicle, more likely than not, had functioning headlights and taillights that were operational and turned 'on' at the time of impact" and (2) "[e]ven if [Decedent's] vehicle did not have functioning taillights, the reflectors covering the taillights would have been illuminated by the Robertson tractor-trailer's headlights." (Doc. 70 at 7, quoting Doc. 70-2 at 9.) They argue Shepston was not qualified to render these opinions because he "has no prior experience in 'electrical work on vehicles,' he is not an electrical engineer, he does not have any training in vehicle electronic systems beyond gathering information from the air bag control module, he has never worked in an auto repair shop and has no experience in manufacturing these

vehicles." (Doc. 70 at 7, citing Doc. 70-4 at 2-3.)

In response, Plaintiffs argue that (1) "Defendants cite no requirement that Shepston has to be an electrical engineer or automobile mechanic to conclude, assuming the headlights on the Jeep were illuminated at the time of impact, whether it is more likely than not that the taillights were also illuminated"; (2) "Defendants fail to mention that since the rear of [Decedent's] vehicle sustained such significant crush and fire damage, making it impossible to test the rear taillights or electrical system, Shepston had no choice but to use an exemplar vehicle to perform the relevant testing"; and (3) "Defendants gloss over Shepston's methodology regarding the vehicle lighting which included inspecting and photographing [Decedent's] Jeep." (Doc. 76 at 6-7.)

The Court agrees with Defendants. First, to determine that Decedent's Jeep had functioning headlights and taillights that were most likely turned on at the time of the collision, Shepston relied only on the facts that (1) "[v]ideo of [Decedent's] vehicle post-crash demonstrated that the headlights were operational," (2) "[r]esearch of [Decedent's] vehicle revealed it was not equipped with daytime running lights, which means in order for the headlights to be illuminated, the headlight switch has to be manually turned to the 'on' position," and (3) "[i]nspection of the exemplar video revealed that when the headlights are manually turned 'on,' the taillights are illuminated as well." (Doc. 70-2 at 8.) There is no methodology in this analysis. Also, Shepston did not examine the actual Jeep involved in the collision and he did not reach his conclusion based on reconstruction of the collision. Moreover, Shepston, as an accident reconstruction expert who admitted he had no experience with vehicle electronic systems, is not qualified to testify to vehicle electrical systems. "[T]he fact that an expert is qualified in a particular field or discipline does not automatically qualify that expert in related disciplines." *Guido v. L'Oreal, USA, Inc.*, 2014 WL 6603730, *7 (C.D. Cal. 2014).

Second, the opinion that, "[e]ven if [Decedent's] vehicle did not have functioning taillights, the reflectors covering the taillights would have been illuminated by the Robertson tractor-trailer's headlights" (Doc. 70-2 at 9) could presumably have been within

the purview of an accident reconstructionist. But Shepston provides no discussion in his report of how he reached this conclusion. And he testified in his deposition that he did not "use[] any tests to determine . . . the reflectiveness of the vehicle's light reflectors" or "recreate the scene at all to determine the visibility of the vehicle to Mr. Robertson as he was driving up to it, given the light sources." (Doc. 70-4 at 8-9.) Because this opinion is not based on any facts or data, the Court will preclude Shepston from testifying as to it.

On final point is worth emphasizing. An expert may, in appropriate circumstances, rely on assumptions when formulating opinions. Fed. R. Evid. 702, advisory committee notes to 2000 amendments ("The language 'facts or data' is broad enough to allow an expert to rely on hypothetical facts that are supported by the evidence."). However, an expert cannot pass off those assumptions as opinions. Thus, although Shepston may not render the *opinion* that the area where the collision occurred was "well-lit" and had clear visibility or that the Jeep had its lights on at the time of the collision, he may be permitted to rely on those *assumptions* in forming his reconstruction and avoidability opinions. *Cf. Biltmore Assocs., L.L.C. v. Thimmesch*, 2007 WL 5662124, *6 (D. Ariz. 2007) ("Although Jenkins is not qualified to offer an opinion as to whether the shareholder claims ever existed, she is permitted to assume that they existed and base her damages calculation on that assumption."). Put another way, the Court does not disagree with Plaintiffs that to "reconstruct[] the details of a collision," Shepston "was required to inspect the scene and the vehicles involved, take measurements, and make certain assumptions." (Doc. 76 at 4.). But those assumptions should be clearly identified so Defendants can seek to challenge them via cross-examination. *See generally United States v. Crabbe*, 556 F. Supp. 2d 1217, 1224 (D. Colo. 2008) ("An expert witness may often 'assume' a fact for purposes of applying the methodology. The assumption may be based upon information supplied to the witness or on someone else's work or opinion. . . . An assumption must be clearly stated as such, because when an assumption is used, the opinion becomes conditional. If the assumption is in error, the opinion may be entirely invalidated."). *See also Marsteller v. MD Helicopter Inc.*, 2018 WL 3023284, *2 (D. Ariz. 2018) ("The challenges to Equals'

opinions and the weaknesses in his assumptions are issues to be explored on cross-examination."); *Flying Fish Bikes, Inc. v. Giant Bicycle, Inc.*, 2014 WL 12621218, *1 (M.D. Fla. 2014) (drawing a distinction between "an expert's unquestioned ability to render an opinion based on assumed facts and an opposing party's ability to factually disprove the expert's factual assumptions" and emphasizing that "[t]he prospect that the opposition might disprove assumed facts . . . presents no barrier to the admissibility of an expert's opinion").

  D. **Reason For Decedent's Slow Speed And Direction Of Travel**

Finally, Defendants argue that Shepston should be precluded from testifying that Decedent was moving to the side of the road due to mechanical malfunction or emergency because this opinion "is based on speculation" and is "not based on any specialized knowledge or expertise or supported by facts." (Doc. 70 at 8-9.)

Plaintiffs respond that "Defendants[] focus on Shepston's testimony as to the possibilities for the Jeep's direction of travel and not on his methodology used for concluding the Jeep was traveling in a south easterly direction." (Doc. 76 at 8.)

This appears to be another instance of the parties talking past each other. Shepston concludes in his report: "The speed of [Decedent's] vehicle and the direction it was traveling is consistent with [Decedent] attempting to drive to the right side of the roadway before the collision occurred—perhaps with his emergency 'flashers' on, and also, perhaps, due to a mechanical or tire failure. Due to damage to [Decedent's] vehicle, however, it is not possible to determine the nature of the problem." (Doc. 70-2 at 10.) In his deposition, Shepston testified that "moving to the right is consistent with wanting to get over" and "if you're at a low speed, that's consistent with wanting to get over." (Doc. 70-4 at 17.) He also conceded that "there are many other reasons why he could have been at that low speed and that direction[,] [h]e could have been drunk[,] [h]e could have been sleeping. . . . We don't know." (*Id.*)

As is evident from the cited portions of Shepston's report and deposition, Shepston has not offered an opinion that Decedent's speed and direction of travel were due to

mechanical malfunction or emergency. In fact, he explicitly concluded in his report that "[d]ue to damage to [Decedent's] vehicle, . . . it is not possible to determine" why Decedent was moving in that direction. (Doc. 70-2 at 10.) It is, thus, unclear why Defendants are trying to preclude Shepston from offering such an opinion. In any event, to the extent Shepston intends to testify to this opinion at trial, he will be precluded from doing so. Shepston may, however, testify regarding Decedent's speed and direction of travel, because such opinions would fall squarely within the category of accident reconstruction.

II.     Defendants' Motion Regarding David Stopper (Doc. 71)

As with Defendants' other motion, although this motion is broadly titled, Defendants clarify they are only seeking "to bar the testimony of plaintiffs' proposed standards of care expert, David A. Stopper ['Stopper'], specifically as it relates to accident reconstruction, perception time, reaction time, visibility, and vehicle electrical systems." (Doc. 71 at 1.) They argue that Stopper's opinions regarding these topics are "anecdotal and speculative" and that Stopper should be precluded from testifying to these opinions because of "the lack of sufficient data for the proposed expert testimony, and the experts' [sic] own admission that he is either not offering an opinion on these issues or did not do the evaluation necessary to provide such opinions." (*Id.* at 4-5.)

In response, Plaintiffs confirm that Stopper will not be testifying (1) "to those things he said he would not be testifying to," (2) "as to any technical specifications for [Decedent's] vehicle," (3) "about the credibility of any witness," or (4) "as to any scientific testing or calculations he performed." (Doc. 77 at 1, 4.) Plaintiffs state Stopper will only "testify as to the standard of care of a commercial vehicle operator, statutes, regulations, and manuals affecting the profession, and his opinions about the cause of this crash." (*Id.* at 4.)

In their reply, Defendants identify three specific opinions in Stopper's report that should be precluded. Those opinions are that: (1) "Defendants' vehicle should have been capable of deceleration rates of at least 13 miles per hour"; (2) the "area of this collision was a very well-lighted section of a major highway"; (3) and "had Mr. Robertson been

alert and keeping a proper forward lookout, while operating the properly equipped air brake, anti-lock brake (ABS) truck tractor semi-trailer, he had more than adequate time and distance to adjust his speed and direction to avoid the collision with [Decedent's] Jeep." (Doc. 79 at 2, citing Doc. 79-4 at 3-4, 12-13.)

Plaintiffs indicate that Stopper will be testifying to various aspects of the standard of care as well as "his opinions about the cause of this crash." (Doc. 77 at 4.) Those are two distinct categories of opinions. And, as Defendants noted in their reply, Stopper's report contains opinions that fall outside those categories. Because Defendants are not challenging Stopper's opinions as to the standards of care, Stopper will not be precluded from testifying as to those opinions. But Stopper provided no methodology for how he determined the cause of the collision. Indeed, Stopper conceded in his deposition that he was not retained to conduct any fieldwork (Doc. 71-2 at 3-4) and his opinion contains no discussion or analysis of any fieldwork that either he or any other expert conducted. Accordingly, Stopper will be precluded from testifying to the cause of the collision. Stopper is also precluded from offering opinions concerning the technical specifications of Decedent's vehicle, the credibility of any witness, and scientific testing or calculations he performed—the categories about which Plaintiffs confirmed he would not be testifying. Finally, as with Shepston, Stopper cannot provide an opinion regarding visibility because he (like Shepston) provided no methodology in his report in support of his opinion that the collision occurred in "a very well-lighted section" of the highway.

III. <u>Plaintiff's Motion Regarding David Krauss, Ph.D. (Doc. 72)</u>

Defendants disclosed Dr. Krauss to testify "in [the] areas of conspicuity, reaction time, and how they related to the accident." (Doc. 72-1 at 16-17.) Dr. Krauss stated in his report that he "ha[s] specialized knowledge in the areas of human factors, human perception and performance, safety, and risk analysis" and "ha[s] extensive publications in this field, including a book." (Doc. 75-1 at 2.) Dr. Krauss's opinions rely on a "looming threshold" theory, which relates to the point at which a driver can perceive a hazard in the distance. (*Id.* at 6-9.) Dr. Krauss states in his report that he "performed a looming

calculation to determine the distance at which a driver in Mr. Robertson's position could first determine that the Jeep was stopped or traveling significantly slower than traffic." (*Id.* at 7.) He concluded that "[e]ven if the taillights were illuminated on the Jeep, Mr. Robertson would not have been afforded enough time and distance to avoid a collision with [Decedent's] vehicle," and "[t]o the extent the taillights on the Jeep were not illuminated, Mr. Robertson's ability to avoid this accident would have been diminished even further." (*Id.* at 10.) In formulating his opinions, Dr. Krauss relied on various publications and reviewed photographs, videos, witness statements, and other documents in the case. (*Id.* at 11-12.)

Plaintiffs seek to preclude Dr. Krauss from testifying at trial, arguing that (1) his opinions are "not based on sufficient facts or data" because "[h]e has not been to the scene" of the collision; (2) "he did not develop a hypothesis prior to forming his conclusions, but instead, based his conclusions upon a preconceived perception of the case"; and (3) "the application of his 'looming threshold' theory is completely subjective and untestable." (Doc. 72 at 6-11.) With respect to the third reason, they specifically take issue with Dr. Krauss's deposition testimony, in which they contend he conceded "that there was no quantifiable methodology to determine when his looming theory is used compared to when it is not." (*Id.* at 5.)

Defendants respond that (1) Dr. Krauss's opinions are based on sufficient facts and/or data, even though he did not go to the scene, because the opinions are "based on . . . accurate and reliable documentary evidence and eye-witness statements"; (2) "[t]he quantification of the looming threshold is mathematically repeatable and testable, as evidenced by Dr. Krauss'[s] extensive list of references attached to his report"; (3) "[l]ooming threshold is a peer reviewed and published phenomenon"; (4) "[l]ooming threshold enjoys general acceptance in the scientific community"; and (5) "a hypothesis is not a requirement for an expert to be allowed to testify" but Dr. Krauss nonetheless generated a hypothesis and applied the scientific method. (Doc. 75 at 4-9.)

The Court will deny the motion. First, Dr. Krauss's failure to personally visit the

scene of the collision is not a valid reason to preclude his testimony—his review of photographs, videos, and witness statements was sufficient. Fed. R. Evid. 703 ("An expert may base an opinion on facts or data in the case that the expert has been made aware of *or* personally observed.") (emphasis added); *Sementilli v. Trinidad Corp.*, 155 F.3d 1130, 1134 (9th Cir. 1998), *as amended* (Nov. 12, 1998) ("The facts that Dr. Ketchum did not personally examine Sementilli, was not personally present at the accident scene, and was not 'privy' to Sementilli's thought processes just prior to the accident do not render his otherwise admissible expert testimony inadmissible. . . . Dr. Ketchum's opinions and inferences were based on his review of Sementilli's medical records, as well as his knowledge, experience, training and education. Under Rule 703, Dr. Ketchum was allowed to rely on such information in forming his opinion.").

Second, Plaintiffs are incorrect in contending Dr. Krauss did not develop a hypothesis before formulating his opinions. In his deposition, although Dr. Krauss testified that he "did not sit down and write down a hypothesis specific to this case because [he has] seen the exact same fact pattern so many times," he stated he formulated a "broad hypothesis . . . that Mr. [Robertson] could not respond to [Decedent's] Jeep in enough time to avoid collision." (Doc. 72-3 at 19-20.)

Third, Plaintiffs are again incorrect in contending the looming threshold theory is "completely subjective and untestable." (Doc. 72 at 8.) Dr. Krauss cited multiple published sources supporting his opinions (Doc. 75-1 at 11) and Plaintiffs do not dispute the validity of these sources. Dr. Krauss also explained why he used the particular looming threshold value of 0.006 in his calculations. (Doc. 72-3 at 116-120.) And Dr. Krauss did not (as Plaintiffs contend) concede that it is impossible to determine when the looming threshold theory should be deemed inapplicable—Dr. Krauss testified that looming threshold analysis is generally the proper perception-time analysis at night. (*Id.* at 31, 106-07.)

…

…

- 12 -

Accordingly, **IT IS ORDERED** that:

1. Defendants' Motion to Bar Report and Testimony of Plaintiffs' Proposed Expert Michael J. Shepston (Doc. 70) is **granted in part and denied in part**;
2. Defendants' Motion to Bar Report and Testimony of Plaintiffs' Proposed Expert David A. Stopper (Doc. 71) is **granted in part and denied in part**; and
3. Plaintiff's *Daubert* Motion re: Testimony of David Krauss, Ph.D. (Doc. 72) is **denied**.

Dated this 16th day of August, 2019.

Dominic W. Lanza
United States District Judge